IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

BRANDON LASSITER,              *

      Plaintiff,          *

v.                    *        Civil Action No. GLR-22-2013

ECI, et al.,             *

      Defendants.      *
                      ***

## <u>MEMORANDUM OPINION</u>

THIS MATTER is before the Court on: (1) Defendants Sara Johnson, RN, Alysia Keene, RN, and Stephanie Cyran, NP's (collectively, "Medical Defendants") Motion to Dismiss, or Alternatively, for Summary Judgment (ECF No. 11); (2) Defendants Eastern Correctional Institution ("ECI"), Chief of Security Monika Brittingham, Warden Debora Darden, Housing Unit Manager Lt. Jason Derr, Warden Walter West, and Assistant Warden Walter Holmes' (collectively, "Correctional Defendants")[1] Motion to Dismiss, or Alternatively, for Summary Judgment (ECF No. 15); and (3) self-represented Plaintiff Brandon Lassiter's Cross-Motions for Summary Judgment (ECF Nos. 18, 20). The Motions are ripe for review, and no hearing is necessary. <u>See</u> Local Rule 105.6 (D.Md. 2023). For the reasons outlined below, the Court will grant Defendants' Motions, construed as motions for summary judgment, and deny Lassiter's Cross-Motions.

---

[1] The Court will direct the Clerk to amend the docket to reflect the full and correct names of Defendants.

# I.     BACKGROUND

## A.     Lassiter's Allegations

Plaintiff Brandon Lassiter is an inmate currently housed at the Dorsey Run Correctional Facility in Jessup, Maryland. (Compl. at 1, ECF No. 1).[2] His claims arise from his incarceration at Eastern Correctional Institution ("ECI") from 2020 to 2022. (Id.). Lassiter alleges that in July 2020 there was no way to access the top bunk in his cell at ECI, so he used a plastic chair that had been issued to him. (Id. at 2). Noticing the chair's instability, he decided to forego using it on his way back down. (Id. at 3). When he landed on the floor, he injured his right knee, which caused excruciating pain. (Id.). Thereafter, he placed several sick calls but was never evaluated due to the COVID-19 pandemic. (Id.). For over a year, Lassiter continued to place sick calls but never received proper treatment. (Id.). Although he was given Tylenol and told that he would be referred to a provider, no such appointment was scheduled, and his pain increased. (Id.). Lassiter submitted a grievance through ECI's Administrative Remedy Procedure ("ARP") regarding the lack of medical treatment. (Id.). Months later, he received cortisone, a knee brace, and a bottom bunk pass. (Id. at 2). He did not appeal the ARP decision. (Id.).

On July 16, 2022, other inmates attacked Lassiter and reinjured his knee. (Id. at 3). He was taken to the medical unit, where he told a nurse about his knee pain. (Id.). The unnamed nurse said he would be referred to a provider, but no such visit ever took place. (Id. at 4).

---

[2] Citations to page numbers in the Complaint refer to the pagination assigned by the Court's Case Management/Electronic Case Files ("CM/ECF") system.

Lassiter alleges that (1) the Correctional Defendants' failure to provide him with a safe way to access the top bunk caused his injury, (Id. at 4−5); (2) the Correctional Defendants failed to ensure adequate medical care (Id.); and (3) the Medical Defendants failed to provide timely and proper care. (Id.).

**B.     Medical Defendants' Response**

According to the Medical Defendants, Lassiter submitted the first sick call slip regarding his knee on June 18, 2020. (Med. Rs. at 195, ECF No. 13-1). At that time, Lassiter reported pain in his right knee from jumping off from the top bunk, and he requested a knee brace. (Id.). On June 20, 2020, the nursing staff responded in a letter, stating that due to operational restrictions caused by COVID-19, a face-to-face assessment would not be needed. (Id. at 112). Nursing staff instructed Lassiter to continue using the previously prescribed Tylenol until he could be seen at his next chronic care visit. (Id.). Lassiter was also told that only a provider could prescribe a bottom bunk or knee brace, and therefore, he should manage his pain by elevating his leg and limiting high-impact exercises. (Id.).

On August 18, 2020, Lassiter saw Shawn Cobb, NP for a chronic care visit. (Id. at 203). Cobb evaluated Lassiter's knee and discussed probable osteoarthritis of the anterior knee. (Id.). Cobb also ordered right knee x-rays and discussed the risks and benefits of a steroid injection. (Id.). Lastly, Cobb renewed Lassiter's Tylenol Extra Strength prescription and referred Lassiter to a provider for follow-up regarding a possible right knee steroid injection. (Id.).

On August 21, 2020, Lassiter had x-rays of his right knee. (Id. at 201). Upon review, the radiologist found "no evidence of an acute fracture, dislocation, or subluxation" and "[a]lignment [was] anatomical." (Id.). Moreover, there was "no acute osseous abnormality." (Id.).

On October 8, 2020, Lassiter submitted a sick call stating that both of his knees were in excruciating pain and claiming that he never got the x-ray results. (Id. at 191). Three days later, Defendant Johnson saw Lassiter for a sick call visit, at which time he was not in distress and was smiling during the assessment. (Id. at 110). Johnson referred him to a provider for x-ray follow-up and directed him to continue the plan of care, which included Tylenol Extra Strength. (Id.).

On December 15, 2020, Lassiter submitted a sick call stating that he was having bad pain in his right knee and the Tylenol was hardly working. (Id. at 188). By letter dated December 20, 2020, the nursing staff sent a letter to Lassiter stating that, due to operational restrictions regarding COVID-19, a face-to-face assessment was not recommended. (Id. at 106). Nursing staff attached instructions on how to alleviate muscle strain to the letter. (Id. at 105). Nursing staff directed Lassiter to follow the instructions and to discuss the ongoing pain flare-ups at his next chronic care appointment. (Id. at 106).

On December 28, 2020, Lassiter saw Johnson during a sick call visit with complaints of knee pain and ineffective medication. (Id. at 102). Lassiter requested Salonpas patches or an increased dosage of Tylenol. (Id.). In response, nursing staff sent a letter to Lassiter telling him that his knee pain complaints would be addressed in chronic care after COVID-19 restrictions were lifted. (Id. at 104).

4

On February 12, 2021, Lassiter saw Ruth Campbell, PA for chronic care. (Id. at 97). Lassiter complained of progressive right knee pain, and Campbell noted that his previous x-ray showed no bony or osseous abnormality. (Id.). Upon examination, Lassiter's right knee had tenderness and moderate pain with motion. (Id.). Campbell prescribed Salonpas patches and Tylenol Extra Strength 500 mg twice per day as needed. (Id. at 98−99). She also referred Lassiter to Dr. Paul Matera to assess the need for a steroid injection. (Id.).

On February 23, 2021, Lassiter submitted a sick call stating he was supposed to see a doctor for a steroid shot. (Id. at 187). On the following day, Johnson saw Lassiter in a sick call regarding his inquiry. (Id. at 91). Johnson reviewed the medical records and noted that Lassiter had been evaluated by a provider who referred him to a doctor for possible steroid injections. (Id.).

On March 12 and 15, 2021, Lassiter submitted sick calls stating that his knee was in extreme pain, and he had not yet received his Salonpas patches. (Id. at 185−86). Johnson saw him in sick call on March 18, 2021. (Id. at 89). Upon examination, Lassiter was in moderate distress due to not receiving the patches. (Id.). He walked without difficulty but complained of severe pain, especially in the right knee. (Id.).

On June 14, 2021, Lassiter saw Oriaku Ijoma, RNP, for chronic care. (Id. at 78). Although Lassiter experienced pain with his knee extended, Ijoma noted no swelling. (Id. at 78−79). Ijoma renewed Tylenol Extra Strength and Salonpas patches. (Id. at 79).

On August 14, 2021, Lassiter submitted a sick call stating that he still had neither received his athletic support or knee sleeve nor had he been evaluated by an orthopedist

for his right knee. (Id. at 174). On August 18, 2021, however, he missed his appointment with Dr. Clem, despite staff calling him several times. (Id. at 69).

On August 20, 2021, Lassiter saw Johnson in sick call after he had complained of not receiving an athletic support, a knee sleeve, or an orthopedic evaluation. (Id. at 67). By the time of the visit, Lassiter had received the athletic support. (Id.). Johnson emailed the provider regarding the status of Lassiter's steroid injection request. (Id.).

On September 1, 2021, Lassiter submitted a sick call complaining that he still did not have a knee sleeve or receive cortisone shots. (Id. at 172). He reported unbearable knee pain and that Tylenol was not working. (Id.). Lassiter also requested an MRI. (Id.). By a letter dated September 5, 2021, ECI West Compound medical staff informed Lassiter that he was scheduled to see the doctor for a possible cortisone shot for his knee. (Id. at 65).

Defendant Alysia Keene, the Assistant Director of Nursing for the West Compound and Annex at ECI, was responsible for overseeing medical staff by ensuring that there are enough nurses to cover the floor. (Keene Decl. ¶¶ 2, 5, ECF No. 11-5). Because her role was largely administrative, she was only involved in the direct care of a patient if a nurse reports a problem or there is a shortage of nurses on the floor. (Id. ¶ 5). Keene stated she was never made aware that Lassiter's medical needs were not being met. (Id.).

On September 8, 2021, Lassiter saw Dr. Paul Matera for a provider visit. (Med. Rs. at 61, ECF No. 13-1). Upon examination, Lassiter had full range of motion, tender medial to patella tendon, slight effusion, and his gait was normal. (Id. at 61−62). Dr. Matera instructed him to avoid full squats, especially with weights, because Lassiter had admitted to doing this exercise. (Id. at 61). Lassiter told Dr. Matera that he had never received his

6

papers authorizing a bottom bunk and that he ordered a knee sleeve, but it had not arrived. (Id.). During that visit, Dr. Matera also performed a joint injection with Kenalog and Lidocaine into the right knee, (id. at 62), and wrote an order for a bottom bunk for one year, (id. at 145). He also prescribed glucosamine while noting that Lassiter had already been prescribed Salonpas and Tylenol Extra Strength for pain. (Id. at 62). On September 23, 2021, Lassiter signed a receipt for knee support. (Id. at 143).

On October 6, 2021, Plaintiff saw Ijoma for chronic care. (Id. at 57). Lassiter told her that the steroid injection was ineffective. (Id.). Ijoma instructed him to follow his exercise plan, and she continued his current medication including glucosamine, Salonpas, and Tylenol Extra Strength. (Id. at 58).

On January 26, 2022, Lassiter saw Natalie Alvarez, NP for chronic care, including pain management for his right knee. (Supp. Med. Rs. at 3, ECF No. 11-4). At that time, Lassiter said he could tolerate prolonged standing at work for about six hours per day, six days per week. (Id.). He also stated that Tylenol and Salonpas helped with pain. (Id.). Alvarez informed Lassiter that Salonpas was on back order, so she switched the order to muscle rub. (Id. at 5). She also renewed Tylenol Extra Strength and glucosamine. (Id.).

On June 11, 2022, Defendant Stephanie Cyran refilled Lassiter's medications including glucosamine, muscle rub, and Tylenol Extra Strength for pain. (Id. at 25−26). Cyran avers that his was the only time she was involved in Lassiter's medical care. (Cyran Decl. ¶¶ 5−6, ECF No. 11-6).

On July 18, 2022, Lassiter submitted a sick call request stating that he had not been seen by chronic care in a long time. (Supp. Medical Rs. at 41). He complained that the

muscle rub was not working for his knee, which was painful and swollen. (Id.). He submitted another sick call request on July 20, 2022, stating he needed Tylenol and Lubriderm/Lubrisoft lotion reordered. (Id. at 40).

On July 21, 2022, Johnson saw Lassiter in response to his two sick call requests. (Id. at 27). Lassiter claimed to have reinjured his knee when he was "'jumped on" by other inmates. (Id. at 27−28). He admitted that he "refused care at the time" but began experiencing pain later. (Id.). Upon examination, Johnson observed no swelling but noted that Lassiter's knee was tender to touch. (Id.). Lassiter claimed that pressure on the knee caused pain and that glucosamine/muscle rub were ineffective. (Id.). Johnson continued his prescriptions for glucosamine, muscle rub, and Tylenol Extra Strength. (Id.).

Lassiter submitted sick call requests on July 29, 2022, and August 6, 2022, complaining of knee pain. (Id. at 42−43). On August 12, 2022, Jennifer Adrion, RN saw him in response to his sick call requests. (Id. at 29−32). During that visit, Lassiter rated his right knee pain at 10/10 and stated that Tylenol was ineffective. (Id.). He was scheduled with a provider. (Id.).

Johnson saw Lassiter in a sick call on September 24, 2022 for right knee pain. (Med. Rs. at 16−17). Lassiter reported that Tylenol and muscle rub were ineffective, and he asked to renew his bottom bunk assignment. (Id.). Johnson searched the records but did not find documentation regarding a bottom bunk. (Id.).

Johnson stated that, as a registered nurse, she cannot prescribe medication or order other medical treatment. (Johnson Decl. ¶ 35, ECF No. 11-3). She also stated that she has no control over provider visits after she submits a referral. (Id.). Johnson also said that

although medical staff did not routinely see patients face-to-face during COVID outbreaks, the delay in scheduling visits was necessary in order to prevent the spread of the disease. (Id.).

On October 5, 2022, Lassiter saw Marie Desir, RN in a sick call for complaints regarding a bottom bunk, lotion, and knee support. (Medical Rs. at 19−20). Desir found no evidence of requests for bottom bunk, lotion, or knee support in the chart, and she indicated that those issues could be addressed during an upcoming visit with a provider. (Id.). On October 11, 2022, Lassiter saw Desir again in sick call, at which she reassured him that x-rays were ordered and a follow-up with a provider would be scheduled as soon as the x-ray results were received. (Id. at 21).

## C.   **Procedural History**

Lassiter filed his Complaint on August 12, 2022. (ECF No. 1). He alleges that the Correctional Defendants were in violation of the Eight Amendment's guarantee against cruel and unusual punishment by failing to provide a safe and secure way to access the top bunk in his cell and ensure that he received proper medical care. (Id. at 2−5). Lassiter also alleges that the Medical Defendants were deliberately indifferent to his needs by failing to provide appropriate care. (Id. at 3−5). Lassiter seeks monetary damages. (Id. at 6).

On November 7, 2022, the Medical Defendants filed a Motion to Dismiss, or Alternatively, for Summary Judgment (ECF No. 11), and on November 17, 2022, the Correctional Defendants filed a Motion to Dismiss, or Alternatively, for Summary Judgment (ECF No. 15). On December 1, 2022, Lassiter filed an Opposition to the Medical Defendants' Motion, (ECF No. 17), as well as a Cross-Motion for Summary Judgment,

(ECF Nos. 17, 18). Medical Defendants filed a Reply on December 15, 2022 (ECF No. 19). On December 16, 2022, Lassiter filed a Joint Opposition to the Correctional Defendants' Motion and a Cross-Motion for Summary Judgment. (ECF No. 20).

## II.   DISCUSSION

### A.   <u>Conversion</u>

Defendants' Motions are styled as motions to dismiss under Federal Rule of Civil Procedure 12(b)(6) or, in the alternative, for summary judgment under Federal Rule of Civil Procedure 56. A motion styled in this manner implicates the court's discretion under Rule 12(d) of the Federal Rules of Civil Procedure. <u>See Kensington Vol. Fire Dep't, Inc. v. Montgomery Cnty.</u>, 788 F.Supp.2d 431, 436–37 (D.Md. 2011), <u>aff'd</u>, 684 F.3d 462 (4th Cir. 2012). This Rule provides that when "matters outside the pleadings are presented to and not excluded by the court, the [Rule 12(b)(6)] motion must be treated as one for summary judgment under Rule 56." Fed.R.Civ.P. 12(d). The Court "has 'complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it.'" <u>Wells-Bey v. Kopp</u>, No. ELH-12-2319, 2013 WL 1700927, at *5 (D.Md. Apr. 16, 2013) (quoting 5C Wright & Miller, Federal Practice & Procedure § 1366, at 159 (3d ed. 2004, 2012 Supp.)).

The United States Court of Appeals for the Fourth Circuit has articulated two requirements for proper conversion of a Rule 12(b)(6) motion to a Rule 56 motion: notice and a reasonable opportunity for discovery. <u>See Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor of Balt.</u>, 721 F.3d 264, 281 (4th Cir. 2013). When the movant expressly

captions its motion "in the alternative" as one for summary judgment and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur. See Moret v. Harvey, 381 F.Supp.2d 458, 464 (D.Md. 2005) (citing Laughlin v. Metro. Wash. Airports Auth., 149 F.3d 253, 260–61 (4th Cir. 1998)).

Ordinarily, summary judgment is inappropriate when "the parties have not had an opportunity for reasonable discovery." E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc., 637 F.3d 435, 448 (4th Cir. 2011). Yet, "the party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party had made an attempt to oppose the motion on the grounds that more time was needed for discovery.'" Harrods Ltd. v. Sixty Internet Domain Names, 302 F.3d 214, 244 (4th Cir. 2002) (quoting Evans v. Techs. Applications & Serv. Co., 80 F.3d 954, 961 (4th Cir. 1996)). To raise sufficiently the issue that more discovery is needed, the non-movant must typically file an affidavit or declaration under Rule 56(d), explaining the "specified reasons" why "it cannot present facts essential to justify its opposition." Fed.R.Civ.P. 56(d).

"The Fourth Circuit places 'great weight' on the affidavit requirement." Nautilus Ins. Co. v. REMAC Am., Inc., 956 F.Supp.2d 674, 683 (D.Md. 2013) (quoting Evans, 80 F.3d at 961). However, non-compliance may be excused "if the nonmoving party has adequately informed the district court that the motion is premature and that more discovery is necessary." Harrods, 302 F.3d at 244. Courts place greater weight on the need for discovery "when the relevant facts are exclusively in the control of the opposing party,"

such as "complex factual questions about intent and motive." Id. (quoting 10B Wright, Miller & Kane, Federal Practice & Procedure § 2741, at 419 (3d ed. 1998)) (internal quotation marks omitted).

Nonetheless, a Rule 56(d) affidavit is inadequate if it simply demands "discovery for the sake of discovery." Hamilton v. Mayor of Balt., 807 F.Supp.2d 331, 342 (D.Md. 2011) (citation omitted). A Rule 56(d) request for discovery is properly denied when "the additional evidence sought for discovery would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment." Ingle ex rel. Estate of Ingle v. Yelton, 439 F.3d 191, 195 (4th Cir. 2006) (quoting Strag v. Bd. of Trs., Craven Cmty. Coll., 55 F.3d 943, 953 (4th Cir. 1995)).

The Court finds that the requirements for conversion have been met here. Lassiter was on notice of conversion because Defendants styled their Motions as alternatively for summary judgment. Further, the Court notified Lassiter of his right to respond to Defendants' Motions and advised that he may file affidavits, declarations, and exhibits along with his response. (See ECF Nos. 12, 16); see also Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975) (holding that district courts must advise self-represented plaintiffs of the right to file extra-pleading materials when a defendant moves for summary judgment). Lassiter did not request discovery, and he responded by filing Cross-Motions for Summary Judgment with exhibits. Accordingly, the Court will construe Defendants' Motions as ones for summary judgment and will consider documents outside of Lassiter's Complaint.

**B.**    <u>**Standard of Review**</u>

In reviewing a motion for summary judgment, the Court views the facts in a light most favorable to the nonmovant, drawing all justifiable inferences in that party's favor. <u>Ricci v. DeStefano</u>, 557 U.S. 557, 586 (2009) (quoting <u>Scott v. Harris</u>, 550 U.S. 372, 380 (2007)); <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 255 (1986) (citing <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144, 158–59 (1970)). Summary judgment is proper when the movant demonstrates, through "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials," that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a), (c)(1)(A). Significantly, a party must be able to present the materials it cites in "a form that would be admissible in evidence," Fed.R.Civ.P. 56(c)(2), and supporting affidavits and declarations "must be made on personal knowledge" and "set out facts that would be admissible in evidence," Fed.R.Civ.P. 56(c)(4).

Once a motion for summary judgment is properly made and supported, the burden shifts to the nonmovant to identify evidence showing there is genuine dispute of material fact. <u>See</u> <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586–87 (1986). The nonmovant cannot create a genuine dispute of material fact "through mere speculation or the building of one inference upon another." <u>Othentec Ltd. v. Phelan</u>, 526 F.3d 135, 141 (4th Cir. 2008) (quoting <u>Beale v. Hardy</u>, 769 F.2d 213, 214 (4th Cir. 1985)).

A "material fact" is one that might affect the outcome of a party's case. <u>Anderson</u>, 477 U.S. at 248; <u>see also</u> <u>JKC Holding Co. v. Wash. Sports Ventures, Inc.</u>, 264 F.3d 459,

465 (4th Cir. 2001) (citing <u>Hooven-Lewis v. Caldera</u>, 249 F.3d 259, 265 (4th Cir. 2001)). Whether a fact is considered to be "material" is determined by the substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." <u>Anderson</u>, 477 U.S. at 248; <u>accord</u> <u>Hooven-Lewis</u>, 249 F.3d at 265. A "genuine" dispute concerning a "material" fact arises when the evidence is sufficient to allow a reasonable jury to return a verdict in the nonmoving party's favor. <u>Anderson</u>, 477 U.S. at 248. If the nonmovant has failed to make a sufficient showing on an essential element of his case where he has the burden of proof, "there can be 'no genuine [dispute] as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322–23 (1986) (quoting <u>Anderson</u>, 477 U.S. at 247).

## C.   <u>Analysis</u>

### 1.   **Medical Defendants**

Lassiter alleges that the Medical Defendants failed to provide him timely and appropriate care for his knee in violation of the Eighth Amendment of the United States Constitution. The Eighth Amendment proscribes "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. U.S. Const. amend. VIII; <u>Gregg v. Georgia</u>, 428 U.S. 153, 173 (1976). To sustain a claim for denial of medical care under the Eighth Amendment, a plaintiff must show that the defendant's acts or omissions were done with deliberate indifference to a serious medical need. <u>See</u> <u>Estelle v.</u>

Gamble, 429 U.S. 97, 106 (1976); see also Anderson v. Kingsley, 877 F.3d 539, 543 (4th

Cir. 2017).

Deliberate indifference to a serious medical need requires proof that, objectively,

the prisoner plaintiff suffered from a serious medical need and that, subjectively, the prison

staff were aware of the need for medical attention but failed to either provide it or ensure

it was available. See Farmer v. Brennan, 511 U.S. 825, 834–37 (1994); see also Heyer v.

U.S. Bureau of Prisons, 849 F.3d 202, 209–10 (4th Cir. 2017); King v. Rubenstein, 825

F.3d 206, 218 (4th Cir. 2016); Iko v. Shreve, 535 F.3d 225, 241 (4th Cir. 2008).

Objectively, the medical condition at issue must be serious. See Hudson v. McMillian, 503

U.S. 1, 9 (1992) (noting that there is no expectation that prisoners be provided with

unqualified access to health care); accord Jackson v. Lightsey, 775 F.3d 170, 178 (4th Cir.

2014). "A 'serious medical need' is 'one that has been diagnosed by a physician as

mandating treatment or one that is so obvious that even a lay person would easily recognize

the necessity for a doctor's attention.'" Heyer, 849 F.3d at 210 (quoting Iko, 535 F.3d at

241); see also Scinto v. Stansberry, 841 F.3d 219, 228 (4th Cir. 2016). Proof of an

objectively serious medical condition, however, does not end the inquiry. See Heyer, 849

F.3d. at 210.

After a serious medical need is established, a successful Eighth Amendment claim

requires proof that the defendant was subjectively reckless in treating or failing to treat the

serious medical condition. See Farmer, 511 U.S. at 839–40; see also Rich v. Bruce, 129

F.3d 336, 340 n.2 (4th Cir. 1997) ("True subjective recklessness requires knowledge both

of the general risk, and also that the conduct is inappropriate in light of that risk."). Indeed,

"[a]ctual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" Brice v. Va. Beach Corr. Ctr., 58 F.3d 101, 105 (4th Cir. 1995) (quoting Farmer, 511 U.S. at 844). The subjective knowledge requirement can be met through direct evidence of actual knowledge or through other evidence that tends to establish the defendant knew about the problem. Scinto, 841 F.3d at 226. This includes evidence "that a prison official knew of a substantial risk from the very fact that the risk was obvious." Id. (quoting Farmer, 511 U.S. at 842).

Mere negligence or malpractice does not rise to a constitutional level. Donlan v. Smith, 662 F.Supp. 352, 361 (D.Md. 1986) (citing Estelle, 429 U.S. at 106); see also Scinto, 841 F.3d at 225 ("Deliberate indifference is 'more than mere negligence,' but 'less than acts or omissions [done] for the very purpose of causing harm or with knowledge that harm will result.'") (quoting Farmer, 511 U.S. at 835) (alteration in original); Russell v. Sheffer, 528 F.2d 318, 318–19 (4th Cir. 1975) ("[M]istreatment or non-treatment must be capable of characterization as 'cruel and unusual punishment' in order to present a colorable claim[.]") (citing Gittlemacker v. Prasse, 428 F.2d 1, 6 (3rd Cir. 1970)).

Reasonableness of the actions taken must be judged in light of the risk the defendant actually knew at the time. See Lightsey, 775 F.3d at 179 (physician's act of prescribing treatment raises a fair inference that he believed treatment was necessary and that failure to provide it would pose an excessive risk). "Disagreements between an inmate and a physician over the inmate's proper medical care do not state a § 1983 claim unless exceptional circumstances are alleged." Wright v. Collins, 766 F.2d 841, 849 (4th Cir.

1985). Additionally, the right to treatment is "limited to that which may be provided upon a reasonable cost and time basis and the essential test is one of medical necessity and not simply that which may be considered merely desirable." United States v. Clawson, 650 F.3d 530, 538 (4th Cir. 2011) (quoting Bowring v. Godwin, 551 F.2d 44, 47–48 (4th Cir. 1977)). Where the seriousness of the injury is not apparent, a delay in treatment does not violate the Eighth Amendment. Brown v. Comm'r of Cecil Cty. Jail, 501 F.Supp. 1124, 1126 (D.Md. 1980).

The record before the Court shows that Medical Defendants addressed Lassiter's complaints regarding his knee. While Lassiter was not always seen face-to-face, that change in treatment was attributable to policies that mitigated the spread of COVID-19 and not to any of the named Defendants. Lassiter faults the Medical Defendants for not providing visits with doctors or specialists or trying alternative treatments. However, the Medical Defendants neither had control over provider visits after a referral is submitted nor did they have authority to order alternative medical treatment. At most, Johnson could have evaluated Lassiter's complaints and renewed his medication, which she often did. Meanwhile, Defendants Cyran and Keene had limited contact with patients, including Lassiter, in their respective capacities.

As previously stated, an inmate's mere disagreement with medical providers as to the proper course of treatment does not support a claim under the deliberate indifference standard. See Wright, 766 F.2d at 849; Wester v. Jones, 554 F.2d 1285 (4th Cir. 1977). Rather, a prisoner-plaintiff must show that the medical provider failed to make a sincere and reasonable effort to care for the inmate's medical problems. See Startz v. Cullen, 468

F.2d 560, 561 (2d Cir. 1972); Smith v. Mathis, PJM-08-3302, 2012 WL 253438, at *4 (D.Md. Jan. 26, 2012), aff'd, 475 F.App'x 860 (4th Cir. 2012). Where Johnson and other medical providers routinely responded to Lassiter's sick calls, examined his knee, ordered x-rays, prescribed Tylenol Extra Strength, and submitted requests for Salonpas patches, knee support, and a bottom bunk, Lassiter has not shown that the Medical Defendants have been deliberately indifferent to his needs.[3]

Lastly, to the extent Lassiter intended to sue Keene in her capacity as a supervisor, his claims must fail. The doctrine of respondeat superior does not apply in § 1983 claims. See Love-Lane v. Martin, 355 F.3d 766, 782 (4th Cir. 2004) (no respondeat superior liability under § 1983). Rather, liability of supervisory officials is "premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'" Baynard v. Malone, 268 F.3d 228, 235 (4th Cir. 2001) (quoting Slakan v. Porter, 737 F.2d 368, 372 (4th Cir. 1984)). To establish supervisory liability under § 1983, a plaintiff must show that: (1) the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) the supervisor's response to the knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) there was an affirmative causal link between the

---

[3] To the extent Lassiter asserts state law claims of medical malpractice and negligence, the Court declines to exercise supplemental jurisdiction and thus will dismiss such claims without prejudice. See 28 U.S.C. § 1367(c)(3).

supervisor's inaction and the particular constitutional injury suffered by the plaintiff. Shaw v. Stroud, 13 F.3d 791, 799 (4th Cir. 1994) (citations omitted). "A single act or isolated incidents are normally insufficient to establish supervisory inaction upon which to predicate § 1983 liability." Wellington v. Daniels, 717 F.2d 932, 936 (4th Cir. 1983) (footnote and citations omitted).

Here, Lassiter has not shown that his constitutional rights were violated by the ECI nursing staff. In addition, his assertions do not demonstrate any pattern of widespread abuse necessary to establish supervisory action or inaction giving rise to § 1983 liability. See id. (stating that "[g]enerally, a failure to supervise gives rise to § 1983 liability, however, only in those situations in which there is a history of widespread abuse"). Accordingly, Keene is entitled to summary judgment.

### 2. Correctional Defendants

#### a. ECI

Section 1983 provides that a plaintiff may file suit against any person who, acting under color of state law, "subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States. 42 U.S.C. § 1983. "Section 1983 'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" Albright v. Oliver, 510 U.S. 266, 271 (1994) (quoting Baker v. McCollan, 443 U.S. 137, 144 n.3 (1979)); Wahi v. Charleston Area Med. Ctr., 562 F.3d 599, 615 (4th Cir. 2009).

As a preliminary matter, ECI is not a "person" subject to suit under 42 U.S.C. § 1983. Several courts have held that inanimate objects such as buildings, facilities, and grounds do not act under color of state law and are not subject to suit under § 1983. See Smith v. Montgomery Cty. Corr. Facility, PWG-13-3177, 2014 WL 4094963, at *3 (D.Md. Aug. 18, 2014) (holding that Montgomery County Correctional Facility "is an inanimate object that cannot act under color of state law and therefore is not a 'person' subject to suit under Section 1983"); Preval v. Reno, 57 F.Supp.2d 307, 310 (E.D.Va. 1999) (stating that "the Piedmont Regional Jail is not a 'person,' and therefore not amenable to suit under 42 U.S.C. § 1983"); Brooks v. Pembroke City Jail, 722 F.Supp. 1294, 1301 (E.D.N.C. 1989) (noting that "[c]laims under § 1983 are directed at 'persons' and the jail is not a person amenable to suit"). Thus, Lassiter's claims against ECI must fail.

### b.     Eleventh Amendment

Lassiter raises claims against the remaining Correctional Defendants, all of whom are State employees. Under the Eleventh Amendment to the United States Constitution, a State, its agencies, and its departments are immune from citizen suits in federal court absent state consent or Congressional action. See Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 100 (1984). Claims against State employees acting in their official capacities are also subject to Eleventh Amendment immunity because a suit against the State actor is equivalent to a suit against the State itself. See Brandon v. Holt, 469 U.S. 464, 471–72 (1985). The State of Maryland has not waived such immunity for claims brought under § 1983. See Pevia v. Hogan, 443 F.Supp.3d 612, 632 (D.Md. 2020). Accordingly, the Correctional Defendants are immune from suit for actions taken in their official capacities.

c.    **Administrative Exhaustion**

The Correctional Defendants contend that Lassiter's claim regarding the lack of proper top bunk access is subject to dismissal under the Prisoner Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e, because it has not been properly presented through the administrative remedy procedure. The PLRA provides in pertinent part that:

> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a).

For purposes of the PLRA, "the term 'prisoner' means any person incarcerated or detained in any facility who is accused of, convicted of, sentenced for, or adjudicated delinquent for, violations of criminal law or the terms and conditions of parole, probation, pretrial release, or diversionary program." 42 U.S.C. § 1997e(h). The phrase "prison conditions" encompasses "all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." Porter v. Nussle, 534 U.S. 516, 532 (2002); see also Chase v. Peay, 286 F.Supp.2d 523, 528 (D.Md. 2003), aff'd, 98 F.App'x 253 (4th Cir. 2004).

Notably, administrative exhaustion under § 1997e(a) is not a jurisdictional requirement and does not impose a heightened pleading standard on the prisoner. Rather, the failure to exhaust administrative remedies is an affirmative defense to be pleaded and proven by defendants. See Jones v. Bock, 549 U.S. 199, 216 (2007); see also Anderson v. XYZ Corr. Health Servs., Inc., 407 F.2d 674, 682 (4th Cir. 2005). A claim that has not

been exhausted may not be considered by this Court. See Jones, 549 U.S. at 220. In other words, exhaustion is mandatory, and a court usually may not excuse an inmate's failure to exhaust. See Ross v. Blake, 136 S.Ct. 1850, 1856–57 (2016).

Ordinarily, an inmate must follow the required procedural steps in order to exhaust his administrative remedies. Moore v. Bennette, 517 F.3d 717, 725, 729 (4th Cir. 2008); see also Langford v. Couch, 50 F.Supp.2d 544, 548 (E.D.Va. 1999) ("The second PLRA amendment made clear that exhaustion is now mandatory."). Exhaustion requires completion of "the administrative review process in accordance with the applicable procedural rules, including deadlines." Woodford v. Ngo, 548 U.S. 81, 88, 93 (2006). This requirement is one of "proper exhaustion of administrative remedies, which means using all steps that the agency holds out, and doing so properly (so that the agency addresses the issues on the merits)." Woodford, 548 U.S. at 90 (quoting Pozo v. McCaughtry, 286 F.3d 1022, 1024 (7th Cir. 2002)). But the Court is "obligated to ensure that any defects in [administrative] exhaustion were not procured from the action or inaction of prison officials." Aquilar-Avellaveda v. Terrell, 478 F.3d 1223, 1225 (10th Cir. 2007).

To pursue a grievance, a prisoner confined in a Maryland prison may file a grievance with the Inmate Grievance Office against any Division of Correction ("DOC") official or employee. Md. Code Ann., Corr. Servs. ("C.S.") § 10-206(a). However, if the prison has a grievance procedure that is approved by the IGO, the prisoner must first follow the institutional ARP process before filing a grievance with the IGO. See C.S. § 10-206(b). Inmates housed at an institution operated by the Department of Public Safety and Correctional Services ("DPSCS") may avail themselves of the administrative grievance

process designed for inmate complaint resolution. See generally C.S. § 10-201 et seq.; Md. Code Regs. ("COMAR") 12.07.01.01B(1) (defining an ARP).

A prisoner in a Maryland Division of Corrections ("DOC") institution must file an ARP with his facility's managing official within thirty days of the date on which the incident occurred, or within thirty days of the date the prisoner first gained knowledge of the incident or injury giving rise to the complaint, whichever is later. COMAR 12.02.28.09(B). If the managing official denies the ARP, the prisoner has thirty days to file an appeal with the Commissioner of Corrections. Id. 12.02.28.14(B)(5). If the Commissioner of Corrections denies the appeal, the prisoner has thirty days to file a grievance with the IGO. Id. 12.02.28.18. The prisoner must include in the grievance copies of the initial request or administrative remedy, the Warden's response to that request, a copy of the ARP appeal filed with the Commissioner of Correction, and a copy of the Commissioner's response. Id. 12.07.01.04(B)(9)(a). If the grievance is determined to be "wholly lacking in merit on its face," the IGO may dismiss it without a hearing. C.S. § 10-207(b)(1); see also COMAR 12.07.01.07(B). An order of dismissal constitutes the final decision of DPSCS for purposes of judicial review. C.S. § 10-207(b)(2)(ii). An inmate has not exhausted his administrative remedies until he has pursued his grievance through all levels. See Woodford, 548 U.S. at 90; see also Gibbs v. Bureau of Prisons, 986 F.Supp. 941, 943–44 (D.Md. 1997).

Here, Lassiter failed to exhaust his administrative remedies regarding his claim that there is no safe way to access the top bunk in his cell. The Correctional Defendants assert that the only grievances Lassiter sent to the IGO relate to failure to protect him from assault

by another inmate and challenge to a disciplinary infraction. (See F. Todd Taylor Decl. ¶ 5, ECF No. 15-2). Although Lassiter attaches copies of ARPs that he filed at ECI, it appears that they only address his claim of inadequate medical treatment. (ECF No. 17-2).

As discussed above, the PLRA requires that inmates exhaust all available remedies prior to filing a civil suit. Because Lassiter failed to exhaust administrative remedies with regard to the conditions in his cell, his claim must fail.

### d.  Deliberate Indifference

Lassiter claims that the Correctional Defendants violated his constitutional rights by failing to ensure that he received proper medical care. However, clinical decisions regarding inmate medical care within DPSCS are the sole responsibility of responsible health care professionals. See COMAR 12.14.05.02 D (stating that "the managing official shall have a written policy specifying that matters of medical, psychiatric, and dental judgment are: (1) the province of qualified health care personnel; and (2) not subject to interference by facility personnel unless necessary to maintain order and security"). As none of the Correctional Defendants personally participated in Lassiter's medical care, they are entitled to summary judgment. Trulock v. Freeh, 275 F.3d 391, 402 (4th Cir. 2001), cert. denied, 537 U.S. 1045 (2002) (stating that liability under § 1983 attaches only upon personal participation by a defendant in the constitutional violation).[4]

---

[4] In any event, Lassiter states that he filed ARPs regarding the lack of medical care, which appear to have been meritorious as they led to his receipt of a cortisone injection, knee brace, and bottom bunk slip. (See Compl. at 2).

## III.   CONCLUSION

For the foregoing reasons, the Medical Defendants' Motion to Dismiss or Alternatively for Summary Judgment (ECF No. 11) and the Correctional Defendants' Motion to Dismiss or for Summary Judgment (ECF No. 15), both construed as motions for summary judgment, are granted. Lassiter's Cross-Motions for Summary Judgment (ECF Nos. 18, 20) are denied. A separate Order follows.

Entered this 13th day of September, 2023.


_____/s/_____
George L. Russell, III
United States District Judge